**NOTICE**

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190371-U

NO. 4-19-0371

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

**FILED**
March 13, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| BARBARA S. TITUS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Cumberland County |
| WILLIAM G. CORNWELL, | ) | No. 16LM12 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | David W. Lewis, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court. Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's finding that defendant failed to prove his claim of adverse possession was not against the manifest weight of the evidence.

¶ 2   In February 2017, plaintiff, Barbara S. Titus, filed an amended complaint against defendant, William G. Cornwell, asserting interference with the use and possession of plaintiff's property located in Cumberland County, Illinois. In March 2017, defendant filed an answer and counterclaim to quiet title to the disputed boundary lines in which defendant claimed ownership by adverse possession. Following a bench trial, the trial court entered a written order finding defendant failed to establish the elements of adverse possession.

¶ 3        Defendant appeals, arguing the trial court's finding that the evidence was insufficient to prove his adverse possession claim is against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                I. BACKGROUND

¶ 5                                A. Undisputed Facts

¶ 6        Plaintiff and defendant own adjacent parcels of land in rural Cumberland County, Illinois. Plaintiff owns a tract of land (approximately 38 acres) described as:

> "The Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section Twenty-Eight (28), Township Eleven (11) North, Range Eight (8) East of the Third Principal Meridian, EXCEPT Two acres in the form of a square out of the Northeast Corner therefore, situated in County of Cumberland and State of Illinois."

(hereinafter, the "Titus property"). Defendant owns a parcel consisting of the two acres in the Northeast corner excluded from the Titus property (hereinafter, the "Cornwell property"). The Cornwell property borders the Titus property on the south and west and it is the southern and western boundary lines of the Cornwell property which are in dispute in the instant matter.

¶ 7        In 1993, Jerry St. John purchased the Cornwell property. St. John was a "junker" and used the property to store his various acquisitions, including cars, trailers, trucks, campers, and scrap metal, referred to throughout these proceedings as "junk." St. John owned the Cornwell property until his death in 2016, at which time defendant purchased the property.

¶ 8        The Titus property has been owned and farmed by several generations of plaintiff's family. In 2015, plaintiff inherited the property from her father.

¶ 9                                B. Proceedings in the Trial Court

¶ 10	In October 2016, plaintiff filed a complaint for ejectment, alleging defendant had encroached on her property, thereby denying plaintiff use of the land for farming income. In February 2017, plaintiff filed an amended complaint seeking to quiet title against any claim of adverse possession asserted by defendant.

¶ 11	In March 2017, defendant filed a counterclaim against plaintiff seeking to quiet title. Defendant alleged (1) a boundary line dispute between the Titus property and the Cornwell property and (2) he had acquired title to the disputed property by adverse possession.

¶ 12	In April 2019, the matter proceeded to a bench trial. Prior to trial, the parties entered a written stipulation as to certain facts and the admissibility of evidence, including (1) a survey conducted by plaintiff and (2) the location of a telephone pole along the roadway 38 feet west of the northwest corner of the Cornwell property. At trial, the parties stipulated the survey marked the true southern boundary line of the Cornwell property, 55 feet north of an area referred to as "the wash," a swampy area of drainage, including from defendant's land. Defendant claimed by adverse possession the 55 feet south of his true southern boundary line, between the southern boundary line and the wash, and extending the entire width of the southern boundary line. Defendant also claimed the 38 feet of property west of his western boundary line (to the telephone pole), and along the entire width of the western boundary line.

¶ 13	At trial, defendant presented the testimony of three witnesses. Bret Patrick, a friend of St. John, testified St. John purchased the Cornwell property in 1993. Patrick visited the property regularly, "at least once a month," while St. John was alive. St. John "collected things he was going to fix. Change. Sell. Manipulate. Something." St. John occupied the area all the way to the wash in the south with junk. As to the west side of the property, Patrick stated St. John's junk extended (in a westerly direction) from his driveway in the northwest corner of the

Cornwell property to at least halfway to the telephone pole. Patrick testified that, for as long as he could remember, there was stuff, "[w]as, and then wasn't, and then was." According to Patrick, St. John "always mowed *** if there wasn't something there." Patrick testified the junk "revolved" as items were sold, and the junk often extended more than halfway to the telephone pole.

¶ 14　　　　　Denny Thornton testified he was the road commissioner for Cottonwood Township and often drove past the Cornwell property either during his commute or in his work as road commissioner. Thornton had been to the back of the Cornwell property (toward the southern boundary line) only once or twice and did not have any knowledge of the area. Thornton estimated St. John occupied an area to the west of his driveway, measuring approximately 25 to 30 feet, with junk. He agreed St. John occupied the area at least halfway from the driveway to the telephone pole.

¶ 15　　　　　Defendant testified he was friends with St. John and, after St. John purchased the property in 1993, he helped St. John move his junk collection to the Cornwell property. Defendant testified St. John "was into buying, selling, and trading." Defendant was on the property at least once every week during the time St. John owned the property. Defendant testified he and St. John placed junk all the way to the wash. He testified the junk placed in the area beyond the true southern boundary line was not always the same but the area between the southern boundary line and the wash was always occupied, including after he purchased the property in 2016. As to the western boundary line, defendant testified that although the junk pile "fluctuated" over the years, he and St. John had always occupied at least 25 feet west of the driveway, and sometimes extending to the telephone pole. Defendant "describe[d] occupied" as "mowed it[,] [w]eed eated it[,]" and "had stuff on it."

¶ 16    Plaintiff presented the testimony of two witnesses at trial. Terry Titus, plaintiff's husband, examined an aerial photograph dated April 11, 1998. Terry identified junk "scattered" near the southern boundary line of the Cornwell property. He testified the "junk line" moved further south after the photograph was taken. As St. John amassed more junk, "it just kept crowding." Terry estimated St. John began placing junk west of the western boundary line approximately 13 years earlier (10 years before St. John's death), stating "it just kept marching outward."

¶ 17    Terry testified multiple individuals spoke to St. John about the "junk" encroaching onto the Titus property. Terry testified, "I think [St. John] made an effort to move it back a little bit, but it just kept creeping over the line." Terry testified they planted vegetation north of the wash to prevent erosion. Terry agreed St. John had junk stacked beyond the western edge of the Cornwell property "maybe at least halfway to the telephone pole[.]"

¶ 18    Terry testified they had farmed all the acreage until sometime after St. John purchased the property and the junk began encroaching onto the Titus property. When examining a photograph dated 1998, Terry testified they had farmed the disputed areas that year.

¶ 19    On cross-examination, Terry testified he had farmed the Titus property for the past 15 years. When shown a photograph dated 1999, Terry agreed there was junk stacked to the wash and, therefore, he did not farm north of the wash.

¶ 20    Justin Titus, plaintiff's son, testified he helped his father farm the Titus property. St. John's junk would move across the Cornwell property boundary lines to the south and west "more and more." Justin testified that "we would ask him to move it, as nicely as possible. And he would move stuff from time to time back across the line to satisfy us at the time." Justin testified the junk made for a "[c]onstant battle" with St. John. Justin described the junk as

moving and changing. Justin did not agree St. John had always occupied space beyond the western boundary line of the Cornwell property because the junk was "in constant motion."

¶ 21 In May 2019, the trial court entered a written order finding "[t]emporarily placing personal property on open (not fenced) adjacent farm ground is not sufficient to establish adverse possession against the true title owner." The court noted the continuous movement of property and St. John's compliance when approached by members of the Titus family to relocate the encroaching property. The court identified St. John's actions as "a clear acknowledgment he recognized that he possessed no right to claim to use the property."

¶ 22 The court also noted the area identified as "the wash" could not be farmed because of the likely erosion of the topsoil. Moreover, grassways north of the wash were left to collect and clean runoff from the junk sitting on the Cornwell property. The court found the evidence failed to establish continuous possession of the property to a visible and ascertainable boundary line. Additionally, "the possession was not hostile or adverse, exclusive or under claim of title inconsistent with that of the true owner."

¶ 23 This appeal followed.

¶ 24 II. ANALYSIS

¶ 25 Defendant argues the trial court's finding the evidence was insufficient to support his adverse possession claim was against the manifest weight of the evidence.

¶ 26 A. Burden of Proof and Standard of Review

¶ 27 To establish title by adverse possession, the claimant must prove possession of the property for the entire 20-year statutory period (735 ILCS 5/13-101 (West 2018)), "and that possession must have been '(1) continuous; (2) hostile or adverse; (3) actual; (4) open, notorious, and exclusive; and (5) under claim of title inconsistent with that of the true owner.' " *Davidson v.*

*Perry*, 386 Ill. App. 3d 821, 824-25, 898 N.E.2d 785, 788 (2008) (quoting *Gacki v. Bartels*, 369 Ill. App. 3d 284, 292, 859 N.E.2d 1178, 1186 (2006)). Further, although not one of the five elements of possession, the claimant must also prove "by clear and convincing evidence the exact location of the boundary line to which they claimed ***." *Schwartz v. Piper*, 4 Ill. 2d 488, 494, 122 N.E.2d 535, 539 (1954).

¶ 28          In adverse possession cases, "[a]ll presumptions are in favor of the title owner, and the party claiming title by adverse possession must prove each element by clear and unequivocal evidence." *Knauf v. Ryan*, 338 Ill. App. 3d 265, 269, 788 N.E.2d 805, 808 (2003). Because the supreme court has not explained the meaning of "clear and unequivocal evidence," courts have applied the clear and convincing burden of proof in adverse possession cases. *Dotson v. Former Shareholders of Abraham Lincoln Land & Cattle Co.*, 332 Ill. App. 3d 846, 855, 773 N.E.2d 792, 800 (2002). We will not disturb the trial court's findings unless they were against the manifest weight of the evidence. *Knauf*, 338 Ill. App. 3d at 269. "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 70, 983 N.E.2d 414.

¶ 29          B. Defendant Failed To Prove Precise Boundaries of the Area Claimed

¶ 30          Defendant argues that he successfully proved "by clear and convincing evidence the exact location of the boundary line" he is claiming. See *Schwartz*, 4 Ill. 2d at 494. Specifically, defendant argues he proved the disputed property on the south side of the Cornwell property was from the "true" boundary line to a point 55-feet south to the wash, and on the western side of the property "to a point at least half-way to the telephone pole" from the western edge of the driveway.

¶ 31        Although defendant correctly cites *Schwartz* for the proposition that it is not necessary for disputed land to be enclosed by a fence, *Schwartz* does require that "the boundaries must be susceptible of specific and definite location." *Schwartz*, 4 Ill. 2d at 493. Several witnesses stated St. John occupied at various times the area all the way to the wash, but their testimony makes a specific and definite boundary less clear. Patrick testified there were areas around the wash that would become saturated and vehicles could not be parked there without getting stuck. Terry testified the Titus family planted vegetation in the area of the wash to prevent erosion. The evidence also showed the junk was sold and removed from the property or relocated on the property at the request of the Titus family. It is not clear, therefore, that a specific and definite boundary existed where St. John's junk piles ended and the wash began.

¶ 32        Similarly, several witnesses stated St. John occupied the area to the halfway point from the driveway to the telephone pole. However, Patrick defined "occupy" as "[St. John] mowed it. Had stuff on it. Moved stuff around on it. Used it as a way, except for where the wash was, to get stuff out of the way to do something else." Thornton testified St. John consistently occupied an area "25, 30 feet maybe" west of the driveway, but when questioned on the distance from the driveway to the property line stake, Thornton estimated it was "[m]aybe 20 feet at least from the driveway to right there." According to defendant's brief, the distance from the driveway to the stake is only 12 feet. The testimony demonstrated none of the witnesses could provide a definitive line that St. John treated as the property line during his possession, which the trial court acknowledged when it found St. John would comply with the Tituses' requests to move his property.

¶ 33　　　　　　We conclude the trial court's determination that the evidence failed to establish continuous possession of property to a visible and ascertainable boundary line was not against the manifest weight of the evidence.

¶ 34　　　　　　　　　　　C. Other Determinations of the Trial Court

¶ 35　　　　　　Even assuming, *arguendo*, defendant proved a definitive boundary line, he was also required to demonstrate possession of the disputed property was (1) continuous; (2) hostile or adverse; (3) actual; (4) open, notorious, and exclusive; and (5) under claim of title inconsistent with that of the true owner. See *Davidson*, 386 Ill. App. 3d at 824-25 (citing *Gacki*, 369 Ill. App. 3d at 292).

¶ 36　　　　　　　　　　　　1. *Continuous Possession*

¶ 37　　　　　　The trial court determined "[t]he personal property location was continuously changing, and when approached by members of the Titus family requesting he move the encroaching property, Mr. St. John would comply." In addition to the testimony provided by plaintiff's witness, Patrick testified the junk piles were "revolving" and continuously moving. The trial court's finding that the possession was not continuous was not against the manifest weight of the evidence.

¶ 38　　　　　　　　　　　　2. *Hostile Possession*

¶ 39　　　　　　The "hostility" element of adverse possession "does not imply actual ill will, but only the assertion of ownership incompatible with that of the true owner and all others." *Joiner v. Janssen*, 85 Ill. 2d 74, 81, 421 N.E.2d 170, 174 (1981).

> "Although evidence of the use and control over land is the typical manner by which any claimant establishes title by adverse possession, it must be clearly shown that the use of the land was adverse and not merely permissive, since

permissive use of land, no matter how long, can never ripen into an adverse possessory right." *Mann v. La Salle National Bank*, 205 Ill. App. 3d 304, 309-10, 562 N.E.2d 1033, 1037 (1990).

Here, the testimony demonstrates that the disputed property was not fenced and there were no permanent structures on the property. Thus, it is reasonable to find the land was vacant and unoccupied. The "[u]se of vacant and unoccupied land is presumed to be permissive and not adverse." *Monroe v. Shrake*, 376 Ill. 253, 256, 33 N.E.2d 459, 461 (1941). Without any testimony as to the intentions of the original occupants to refute such presumption, the trial court's determination that the use was permissive is not against the manifest weight of the evidence.

¶ 40                          3. *Actual Possession*

¶ 41          "The making of improvements or acts of dominion over land, indicating to persons residing in the immediate neighborhood who has exclusive management and control of the land, are sufficient to constitute possession." *Ewald v. Horenberger*, 37 Ill. App. 3d 348, 351, 345 N.E.2d 524, 527 (1976). In this case, the trial court did not make a specific finding as to actual possession, and the parties do not argue this element.

¶ 42                  4. *Open, Notorious, and Exclusive Possession*

¶ 43          The adverse claimant's possession of the land at issue must "be of such open and visible character as to apprise the world, that the property has been appropriated, and is occupied." (Internal quotation marks omitted.) *Estate of Welliver v. Alberts*, 278 Ill. App. 3d 1028, 1038, 663 N.E.2d 1094, 1100 (1996). As stated above, the testimony in this case demonstrated St. John's property was continuously in motion, sometimes at the request of the Tituses. Further, the Tituses testified to use of the disputed property at times, including planting

vegetation around the wash to prevent erosion. Thus, the trial court's finding the use was not exclusive was not against the manifest weight of the evidence.

¶ 44          5. *Claim of Title Inconsistent With That of the True Owner*

¶ 45          "Using and controlling property as owner is the ordinary mode of asserting a claim of title inconsistent with that of the true owner." *Peters v. Greenmount Cemetery Ass'n*, 259 Ill. App. 3d 566, 570, 632 N.E.2d 187, 190 (1994). This element is similar to the elements of actual possession and hostility. As mentioned, the testimony demonstrated St. John acquiesced to the Tituses' requests to move his encroaching property. As the trial court determined, St. John's acquiescence is "a clear acknowledgement he recognized he possessed no right to claim to use the property." Therefore, the trial court's determination was not against the manifest weight of the evidence.

¶ 46          As a last matter, we thank the trial court for thoroughly stating its findings and reasoning in a written order, which we found very useful in our consideration of this appeal.

¶ 47          III. CONCLUSION

¶ 48          For the reasons stated, we affirm the trial court's judgment.

¶ 49          Affirmed.